### IN RE ELIJAH J. ET AL.*
### (AC 34868)

Lavine, Alvord and Sheldon, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued November 16, 2012—officially released February 22, 2013**

*David J. Reich,* for the appellant (respondent father).

*Carolyn Signorelli,* assistant attorney general, with whom, on the brief, were *George Jepsen,* attorney general, *Gregory T. D'Auria,* solicitor general, and *Benjamin Zivyon,* assistant attorney general, for the appellee (petitioner).

** February 22, 2013, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Erich H. Gaston*, assigned counsel, for the minor children.

*Opinion*

SHELDON, J. In this case, the respondent father[1] of two minor children, Elijah J. and Jasmine J., appeals from the judgments of the trial court, *Rubinow, J.*, ordering the termination of his parental rights on the petitions filed by the petitioner, the commissioner of children and families (commissioner), seeking such relief pursuant to General Statutes § 17a-112 (j) (3) (B) (i). The judgments were based upon findings by the court that termination of the respondent's parental rights was in the best interests of the children, who had previously been adjudged to be neglected upon the plea of nolo contendere of their mother and custodial parent, Linda J., at a hearing where the respondent, as noncustodial parent, stood silent. The termination was based on the respondent's failure, despite reasonable efforts by the department of children and families (department) to reunite him with the children after their neglect adjudications, to follow specific steps issued to him by the neglect court to achieve a sufficient degree of personal rehabilitation so as to warrant the belief that he would be capable, within a reasonable period of time in light of the needs and ages of the children, of assuming a responsible role as parent in their lives.

The respondent claims on appeal that the court erred in reaching the foregoing conclusions in two ways. First, he argues that the court erroneously based its conclusions in material part upon his election to stand silent at the plea hearing in the neglect proceeding, which it improperly treated as a tacit admission of the truth of

---

[1] The parental rights of the mother, Linda J., also were terminated, but she has not appealed from those judgments and she is not a party to this appeal. We therefore refer in this opinion to the respondent father as the respondent.

the allegations of the neglect petition pertaining to him. Second, he claims that the court erroneously determined that the neglect court had issued specific steps for reunification. Specifically, he claims that, at the conclusion of the plea hearing, when the children were adjudged to be neglected and committed to the custody of the commissioner, the neglect court, *Eschuk, J.*, failed to issue any specific steps for him to follow to achieve personal rehabilitation as a parent, and thus he cannot lawfully be found to have forfeited his right to pursue reunification with his children for failing to succeed in his rehabilitative efforts by following such specific steps.[2]

The commissioner disputes both of the respondent's claims. As for the first claim—challenging the court's alleged treatment of the respondent's silence at the plea hearing where his children were adjudged to be neglected as a basis for making its essential findings of fact against him in this case—the commissioner asserts that the court's only reference to the respondent's silence was a technically accurate description of the proceedings before the neglect court that merely set the stage for, but did not answer, its ultimate inquiry as to the success or failure of the respondent's efforts to achieve personal rehabilitation as a parent following the neglect adjudications. Even, then, if the court's description of the respondent's silence at the plea hearing can be understood to have misdescribed such silence as an admission of the truth of the allegations of the neglect petition, the commissioner argues that that misdescription was not a harmful error because it had no effect upon the outcome of this case.

---

[2] The respondent also claims that the court's findings that the department made reasonable efforts to reunify him with his children and that he was unable or unwilling to benefit from services provided by the department were clearly erroneous. On the basis of the extensive factual findings set forth by the court, accompanied by the citations to the evidence in the record that substantiated those findings, the respondent's claim is without merit.

As for the respondent's second claim of error—challenging the court's determination that the neglect court had issued specific steps for him to follow to achieve personal rehabilitation as a parent, and thus to pursue reunification with the children–the commissioner flatly disagrees with the respondent based upon the record of the plea hearing in the neglect proceeding, which assertedly demonstrates otherwise. For the following reasons, we agree with the commissioner as to both of the respondent's claims, and thus affirm the court's judgments terminating the respondent's parental rights with respect to both Elijah and Jasmine.

I

THE TRIAL COURT'S DECISION

In reaching its decision, the trial court made the following relevant findings as to the historical and procedural facts and circumstances that led to the institution of the present termination proceedings. "On December 28, 2007, shortly after his [son, Elijah's] birth, [the commissioner of the department of children and families (commissioner)] obtained an order of temporary custody (OTC) for Elijah . . . and filed a neglect petition alleging that he was denied proper care and attention, physically, educationally, emotionally or morally, and/or that he was permitted to live under conditions, circumstances or associations injurious to his well-being while in the custody of his parents. Among other things, the [commissioner] alleged that Linda J. then: had untreated 'extensive mental health issues'; had been diagnosed with bipolar disorder; had a history of numerous inpatient admissions for mental health treatment; had tested positive for marijuana and cocaine so that Elijah had also tested positive for cocaine when he was born; had a history of domestic violence with [the respondent]; had been arrested for domestic violence herself; and had failed to attend anger management.

[The commissioner] also alleged that [the respondent] had violated protective orders issued for Linda J. and that he had a history of substance abuse issues. On January 14, 2008, the court . . . sustained the OTC by agreement of the parties.

"On March 11, 2008, the court . . . confirmed that [the respondent] was Elijah's biological father, and ordered the child's commitment to [the commissioner] upon accepting the respondent-parents' joint no contest pleas to the sole ground of conditions injuri[ous], whereby they effectively acknowledged that the court would rely upon the truth of [the commissioner's] allegations. On July 15, 2008, the court . . . revoked that commitment, and ordered Elijah returned to his parents' custody with six months of protective supervision. The court . . . terminated protective supervision on December 10, 2008.

"[The respondent] was arrested on March 10, 2010 and commenced a one year term of incarceration. On August 27, 2010, Linda J. gave birth to their daughter, Jasmine. On September 8, 2010, [the commissioner] imposed a ninety-six hour hold upon both [Jasmine] and Elijah. The children have remained in [the commissioner's] custody . . . since [that date].

"On September 10, 2010, the court . . . granted [the commissioner's] ex parte application for an OTC and issued specific steps for each parent and [the department of children and families (department)] to follow, having found that both children were in immediate physical danger from their surroundings and that it was contrary to their welfare to remain living with Linda J. On that date, [the commissioner] filed a second neglect petition for Elijah, and a first petition for Jasmine, alleging that the children were being denied proper care and attention, physically, educationally, emotionally or morally, and/or that they were then being permitted to

live under conditions, circumstances or associations injurious to their well-being. As jurisdictional facts, [the commissioner] alleged that: '[Linda J.] has an extensive substance abuse history. . . . [Linda J.] has an extensive mental health history and is not in treatment. . . . [Linda J.] is unable to provide a safe, stable and substance free environment for her children at this time, as she has been admitted on a police committal at Waterbury Hospital. . . . [The respondent] is incarcerated.' More specifically, [the commissioner] supported the neglect petitions through a summary of facts substantiating allegations of neglect that repeated the primary grounds set forth in support of Elijah's 2007 neglect petition, referencing [the respondent's] domestic violence and substance abuse issues and claiming, in addition, that while hospitalized 'on [September 1, 2010], [Linda J.] was unable to have a behavioral evaluation due to her agitation and psychosis . . . [Linda J.'s] urine . . . was positive for cocaine [and] . . . [the respondent] is unable to provide care for his children as he is currently incarcerated . . . for possession with intent to sell with a maximum release date of March 9, 2011.'

"On September 17, 2010, the court (*Eschuk, J.*) sustained the OTC upon the parties' agreement and found that [the respondent] was Jasmine's legal father. The OTC steps were not modified and thus remained in effect. On December 22, 2010, the court (*Eschuk, J.*) accepted Linda J.'s nolo contendere plea to the neglect petitions that were amended to reflect the sole ground of denial of proper care as to each child. Consistent with his incarceration at the time of plea, and his status as a noncustodial parent, [the respondent] remained silent. Both children were adjudicated neglected. In this context, Linda J.'s no contest plea and [the respondent's] election to stand silent indicated their functional acknowledgment of the truth of [the commissioner's]

allegations as to the current causes for Elijah's and Jasmine's commitment to [the commissioner]. The court reaffirmed the steps that had been put in place with the OTC. . . .

"In March, 2011, [the respondent] was released from incarceration and commenced a two year period of probation supervision. On June 9, 2011, [the commissioner] filed the . . . [termination of parental rights] petitions, alleging that the department had made reasonable efforts to reunify the children with each parent, and that each parent had failed to achieve statutory rehabilitation." (Citations omitted.)

Following a trial on the termination petitions, at which testimony was presented from several witnesses,[3] including the respondent, and a multitude of documents were admitted into evidence, the court issued a memorandum of decision on July 3, 2012, terminating the parental rights of Linda J. and the respondent as to Elijah and Jasmine. In so doing, the court made the following preliminary findings. "[The respondent] has a long history of domestic violence, drug related criminal conduct, and a pattern of violating court orders, all occurring during his adult years. On September 7, 2005, when he was nearly thirty-six years old, [the respondent] was charged with sale of a controlled substance, risk of injury to a minor, and assault in the [third] degree; he was held in lieu of bond. On November 22, 2005, [the respondent] was found guilty and was sentenced to three years of incarceration, suspended, with three years of probation. On May 10, 2006, while he was on probation, [the respondent] engaged in domestic violence with Linda J. [and was] charged with breach of peace; he was again held in lieu of bond. A [criminal protective order] was issued prohibiting his contact

---

[3] The court also heard testimony from various social workers, a police officer and a few of the respondent's service providers.

with Linda J. from May 11 through July 11, 2006. On June 6, 2006, [the respondent] was charged with violation of probation. On July 11, 2006, he was found guilty of violation of probation and breach of peace, and received a ninety day jail sentence. . . .

"On June 24, 2007, [the respondent] was arrested and charged with violating the outstanding [criminal protective order] prohibiting him from contact with Linda J. He was again held in lieu of bond, and became subject to a new [criminal protective order] that prohibited him from engaging in violence with Linda J. from September 18 through November 30, 2007. On November 30, 2007, [the respondent] was found guilty of violating a criminal protective order, and was sentenced to two years of incarceration, suspended, with three years of probation. . . .

"Elijah was born to [the respondent] and Linda J. on December 25, 2007. On March 10, 2010, when Elijah was two years old, [the respondent] was charged with possession of illegal drugs with intent to sell, was incarcerated in lieu of bond, and was thus separated from his son. On June 28, 2010, [the respondent] was found guilty, and was sentenced to three years of incarceration, suspended after he served one year, with two years of probation. . . .

"Jasmine was born on August 27, 2010, while [the respondent] was incarcerated. On September 10, 2010, when she was taken into [the] custody [of the commissioner] along with Elijah, the court ordered [the respondent] to follow specific steps that were reaffirmed at the children's commitment on December 22, 2010. The steps established the [respondent's] rehabilitative goals: '(1) Demonstrate an understanding of the stages of child development. (2) Acquire and utilize age appropriate parenting skills. (3) Effectively manage personal

schedules, budget, and home environment. Demonstrate ability to support and function independently. (4) Cooperate with a substance abuse evaluation to gain insight on your drug issues and follow any and all recommendations. (5) Maintain . . . sobriety and remain clean of illegal drugs, maintain a safe, stable drug free living environment.' . . . As predicates to reunification, among other things, the steps further ordered [the respondent] to: take part in parenting counseling; undergo substance abuse evaluation, testing and treatment; maintain adequate housing and legal income; visit the children as often as [the department] permits; cooperate with 'mental health treatment' service providers; abide by conditions of probation; and refrain [from] domestic violence and unlawful conduct. . . .

"On March 8, 2011, [the respondent] was discharged to probation. Soon thereafter, he visited the [department] office and discussed the specific steps, and the services that would be provided by the department, such as visitation. He also discussed the services that [the department] would coordinate . . . such as visitation, mental health and substance abuse services. . . .

"On March 18, 2011, a mere ten days after his release from prison, [the respondent] became involved in a physical altercation with Anthony M., with whom Linda J. had been romantically involved while the [respondent] was incarcerated. During this incident, [the respondent] suffered a stab wound on the back left side of his body, and a punctured lung. At the hospital, he received care and was charged with disorderly conduct. . . .

"Referred by [the department], [the respondent] completed a twelve session fatherhood workshop at the Fatherhood Initiative during the spring and summer of 2011. This wraparound program included parenting

classes and other services designed to provide fathers with the skills to face life's challenges so they can play a larger role in their children's lives. . . .

"Referred by probation, [the respondent] was evaluated at the [Morris Foundation] in May, 2011, for mental health and substance abuse issues; he was diagnosed with anxiety, depressive disorder, and a history of abusing illegal drugs. A psychiatric nurse practitioner who performed regularly scheduled consultations for [the respondent] starting in May, 2011, so he was prescribed medication for treatment of the major depression, related sleep disturbance, and the co-occurring addiction issues that were noted by the [Morris Foundation] staff. The [respondent] . . . takes these medications in addition to the narcotics that are prescribed by a family health center for his back and leg pain. . . .

"On September 6, 2011, [the respondent] violated the prohibition against domestic violence and criminal conduct established by the specific steps and the conditions of his probation, when he was charged with breach of peace involving Linda J. Held in lieu of bond, the court . . . imposed a [criminal protective order] that prohibited [the respondent] from contact with Linda J. [The department] learned of [the respondent's] incarceration on September 8, 2011; he was released to the community in early October, 2011. On November 15, 2011, [when the respondent] was convicted of breach of peace [and] sentenced to an unconditional discharge, the extant [criminal protective order] expired on its own terms. . . .

"In conjunction with his medication management, the [Morris Foundation] staff referred [the respondent] to group therapy in August, 2011, so he could participate in a men-only, psycho-educational, mental health support group that was designed to help him develop coping strategies to deal with his mental health symptoms. [The

respondent] attended three sessions, but was unable to further participate after his September 6, 2011 domestic violence arrest. When he was released from incarceration in October, 2011, [the respondent] requested individual counseling, which has since been made available to him at the [Morris Foundation]. . . .

"[The respondent] has not maintained stable housing. From time to time, he has lived with Linda J. However, by September 13, 2011, after his arrest for domestic violence, when he had already completed the Fatherhood Initiative program and had undergone several months of treatment at the [Morris Foundation], [the respondent] was homeless. He had no housing resources available for himself or for the children, either." (Citations omitted.)

With that factual backdrop, the court turned to its analysis of the department's reunification efforts with respect to the respondent. "Throughout the child protection proceedings, [the department] provided [the respondent] with: communication with service providers to check on progress toward goals; case management; transfer conferences and case supervision; and referrals for necessary rehabilitative treatment. . . . While he was incarcerated from March, 2010, through March, 2011, [the department] had phone contact with [the respondent] to provide information concerning [the department's] role with the family; and to answer questions concerning the department's expectations and services, and the status of the children; and to coordinate its rehabilitation services with those available through probation upon his release. [The department] specifically offered to investigate housing resources available for [the respondent], other than impermanent shelters, to resolve his recurrent homelessness and to assist in compliance with the specific steps' housing criteria. . . . In 2011, when he was at liberty, [the department]

referred [the respondent] to . . . the Fatherhood Initiative. . . . [The department] also explored [the respondent's] family resources for the children's placement with relatives.[4] . . .

"The department appropriately relied upon probation's referral to the [Morris Foundation] for [the respondent's] mental health and substance abuse treatment, as this formed an inherent part of [the department's] extension of this [respondent's] rehabilitation and reunification efforts. . . . As previously found, [the respondent] was evaluated at the [Morris Foundation] following his March, 2011 release from incarceration . . . received medication therapy there, was referred to group counseling, and subsequently to individual counseling. Although he has missed some medication and counseling visits, due in part to his September, 2011 incarceration, [the respondent] has been largely compliant with the treatment schedule set up for him at [the Morris Foundation]. . . .

"[The respondent's] experience with visitation clearly and convincingly illustrates both [the department's] reasonable extension of reunification efforts, and his inability or unwillingness to benefit from this service. [The department] arranged supervised visitation for [the respondent] while his children were in [the commissioner's] custody, and provided transportation to and from visits; when the [respondent] . . . was incarcerated, [the department] was unable to facilitate his access to reunification services other than visits. . . . As of June, 2011, when [the respondent] had commenced his mental health and substance abuse treatment at the [Morris Foundation], [the department]

---

[4] The court also noted: "[The respondent] indicated that there were no relatives in Connecticut who could care for the children, and he declined to provide sufficient details about out-of-state resources to enable the department to examine other individuals, despite the steps' requirement that he make such information available."

provided visits at [its] office twice per week, on Tuesdays and Thursdays; both Linda J. and [the respondent] attended at their mutual request. . . . [The respondent's] attendance at visits became inconsistent after his September 6, 2011 domestic violence arrest. On October 5, 2011, after his release from incarceration, [the respondent] called [the department] to explain that his 7:30 a.m. to early evening work schedule would not permit him to visit at that time; he repeated this information when he called [the department] again on October 13, 2011. [The department] graciously offered to accommodate [the respondent] by providing after-hours or Saturday visitation sessions if the department could [provide the respondent with] access to transportation services. [The respondent] visited on November 4, 2011, but did not attend any scheduled visits in December or the visit set for Saturday, January 14, 2012. . . .

"During the winter of 2012, after [the respondent] lost his employment, but while he continue[d] to have access to mental health treatment at the [Morris Foundation], and when he was more available for visits, [the department] provided a parenting coach at [the respondent's] visits as a reasonable effort at improving his parenting behaviors. Although he attended visits more regularly, [the respondent] remained remote, most often merely observing his children's behavior during these sessions. Without interacting, [the respondent] was largely unresponsive to Elijah, although he was somewhat attentive to baby Jasmine. Overall, besides delivering a prompted greeting, or assisting Jasmine when she needed to have her coat put on at the end of visits, [the respondent] demonstrated little interest in or ability to perform even minimal parenting functions such as [joining in] his son's efforts at play activities or conversation. . . . [The respondent's] conduct indicates that despite [the department's] reasonable efforts,

he was unable or unwilling to benefit from the reunification services extended by way of visitation.

"Composite reunification efforts have yielded no progress in [the respondent's] ability to cope with his mental health symptoms or in his personal functioning. Even with his individual therapist at [the Morris Foundation], he is overly guarded, and must be prompted to answer the counselor's questions, demonstrating the same remoteness and detachment in counseling sessions that he exhibits in his poor quality visitation sessions with the children. [The respondent's] flat affect, depression, sadness and difficulty sleeping persist notwithstanding [the Morris Foundation's] multimodal treatment; in February, 2012, [the respondent] admitted that he had a significant amount of anger toward people, and that he recently had nightmares about hurting people. These recent statements concerned the [Morris Foundation] counselor, especially in view of [the respondent's] violent criminal history; they concern the court in view of the [respondent's] ostensible desire to serve as a custodian for his children. Altogether, [the respondent's] . . . experiences [at the Morris Foundation] clearly indicate that this [respondent] has, as yet, been unable to achieve measurable benefit from mental health services. . . .

"[The department's] referral to the Fatherhood Initiative was timely and highly relevant for [the respondent], who required assistance in learning to fulfill the minimal aspects of parenting, such as learning to demonstrate affection and compassion, self-care and financial stability, identification of community resources, and self-control. Training in each of these areas, and more, [was] available through the Fatherhood Initiative program. . . . [The respondent], however, failed to acquire the skills promote[d] by this program, as illustrated by his September, 2011 arrest, his failure to maintain employment or stable housing, and his conduct during those

visits he attended after completing the Fatherhood Initiative. Despite this wraparound service, [the respondent] was unable or unwilling to benefit from any of the targeted efforts to [which] he has been referred. . . .

"In sum, notwithstanding the department's efforts and the efforts of probation, the clear and convincing evidence establishes that [the respondent] cannot or will not acquire benefit from any aspect of reunification services within the meaning of § 17a-112 (j) (1). Under the totality of the circumstances, the clear and convincing evidence thus establishes that [the department] has met its burden of proving the reunification element of [the respondent's] [termination] petition[s]." (Citations omitted.)

The court then turned as follows to the issue of whether the department had proven that the respondent had failed to achieve sufficient personal rehabilitation, as required by § 17a-112 (j) (3) (B) (ii): "On December 22, 2010, when he stood silent to the no contest plea Linda J. tendered in response to [the department's] amended neglect petitions, [the respondent] tacitly authorized the court to accept as true, and to act upon, the facts as alleged by [the department] concerning: his unlawful conduct, which led to incarceration and separation from his children; his inability or unwillingness to provide financial support for the children; and the fact that he could not provide a stable home environment that was appropriate for or able to meet the developmental needs of either Elijah or Jasmine. . . . These factors, identified by [the department] in support of its underlying neglect petition[s] and addressed by the specific steps, effectively formed the basis for the court's adjudication of neglect, and constituted the causes for the children's commitment on that date. . . . The clear and convincing evidence establishes that these factors have never been corrected, and confirms that the department has met its burden of proving that

[the respondent] has failed to achieve the sufficient degree of rehabilitation as contemplated by § 17a-112 (j) (3) (B) [(ii)]. . . .

"The specific steps originally imposed with the OTC, and reimposed with the neglect adjudication, served as guides for [the respondent's] rehabilitation. The steps warned the [respondent] that if he did not adhere to the court's orders, a [termination] petition could be filed and the children could be placed for adoption. The steps further reminded [the respondent] that he should contact [his] lawyer and/or [the department's social] worker if [he] need[ed] help in reaching any of these steps. . . .

"There is no evidence in this case from which the court could reasonably conclude that [the respondent] has achieved a level of rehabilitation that would reasonably encourage the belief that, at any time in the foreseeable future, he could serve as a safe, consistent, reliable and effective parent for Elijah and Jasmine. To the contrary, although he has complied with some of the specific steps, the clear and convincing evidence reflects that [the respondent] has not yet overcome his predilection for impulsive, unlawful and violent conduct; his transient lifestyle; his inability or unwillingness to secure financial support for the children; and his antisocial demeanor which renders him remote, uncommunicative, detached from, and unresponsive to the needs of his very young children. As such, he has not achieved personal rehabilitation.

"[The respondent's] failure to correct the causes of commitment, and his failure to achieve rehabilitation, is evident through his long-standing pattern of criminal conduct, and his violation of the specific steps' prohibition [of] involvement in new criminal acts. Because [the respondent] was arrested in March, 2010, charged with

possession with intent to sell illegal drugs, and incarcerated for approximately one year thereafter, thus his own conduct rendered him unavailable to attend Jasmine's birth on August 27, 2010, or to be present at Elijah's third birthday on December 25, 2010. Nonetheless, in violation of the steps' prohibition against illegal activity and requirement for compliance with the probation related to his drug related conviction, [the respondent] engaged in disorderly conduct on March 18, 2011, only ten days after his release from a one year sentence of imprisonment. Furthermore, despite his ostensibly successful participation in the Fatherhood Initiative program in the spring and summer of 2011, and despite his medication management and counseling at the [Morris Foundation] during the ensuing months, [the respondent's] lack of rehabilitation was prominently, clearly and convincingly evident when he again engaged in domestic violence with Linda J. on September 6, 2011. This conduct, resulting in [the respondent's] arrest for breach of peace followed by a month of incarceration, again violated the steps' [mandate] to follow the law, as had his conduct on March 18, 2011, and required the imposition of . . . yet another [criminal protective order] to regulate the [respondent's] volatile relationship with [Linda J.]. . . .

"[The respondent]'s failure to achieve personal rehabilitation is further apparent in his failure to meet the specific steps' requirement that he visit his children as often as [the department] permitted. While he visited consistently in June, July and August of 2011, that compliance was short-lived. [The respondent]'s self-created incarceration in September, 2011, prevented him from visiting during that month. As found above, although [the department] again made twice weekly visits available to [the respondent] after his October 4, 2011 release, and although the department proffered very

reasonable accommodations, including proffering evening or weekend meetings with his children, [the respondent] elected to engage in work activities instead of making time available to visit Jasmine and Elijah on a regular basis. Even when he did attend visits in late 2011, after finishing the Fatherhood Initiative program and after many months of treatment at the [Morris Foundation], his communication with Elijah and Jasmine was ineffectual, at best, demonstrating lack of compliance with the steps' order that he utilize age-appropriate parenting skills. Even with the addition of a parenting coach at visits, there was no improvement in [the respondent's] ability or willingness to engage in meaningful parental activities with his children at visits. [The respondent's] interactions with the children was of very poor quality, and he never learned to communicate with them in an appropriately supportive manner during visits. . . .

"[The respondent's] conduct, as a whole, is sufficient to support the conclusion that he is either indifferent to his children's well-being, incapable of oral communication or play interaction with them, and/or unable to provide secure, consistent and effective management of their behavior, even in a controlled environment. When visits did occur, although he appropriately greeted them, [the respondent] otherwise had limited interaction with either child, sometimes holding Jasmine, but not responding to Elijah's efforts at obtaining attention from his father. Despite his protests that he has [a] valid interest in serving as a parent to his children, [the respondent's] demeanor and comportment [belie] this position. . . . He perceives his role, during visits, as that of an observer, not as a parent who willingly and appropriately interacts with, instructs, and shows love and affection for his children. . . . During contact with Elijah and Jasmine, [the respondent] did

not demonstrate even rudimentary parenting skills, notwithstanding the Fatherhood Initiative program in which he had participated, and the comprehensive mental health treatment that has been extended to him through [the Morris Foundation's] services referral made by probation. The visits, unsatisfactory in quality, perhaps provided some value for [the respondent], but no positive impact upon either child was evident. Sadly, [the respondent] has no insight into the nature or extent of his children's experiences with him; he perceives the visits as being fairly good. . . . These factors clearly and convincingly establish that notwithstanding the long period of time Elijah and Jasmine have spent in foster care, their biological father has never developed even the minimal attributes of parenting, and has not achieved the degree of rehabilitation necessary to indicate that he could serve as a reliable parenting resource within the foreseeable future.

"[The respondent's] failure to comply with other significant aspects of the court-ordered steps further clearly and convincingly establish[es] his failure to achieve personal rehabilitation. For instance, he failed to promptly inform [the department] of his current address after his release from incarceration in March, 2011, causing a delay in the implementation of visits with the children. . . . He has failed to maintain stable housing, sometimes living with Linda J., sometimes with a relative, and sometimes remaining homeless. . . . He failed to comply with the steps' obligation to inform [the department] of the names of individuals with whom he was living in the home he occupied in January, 2012, after he had lost his employment. . . . While the steps required [the respondent] to maintain employment, and while he claimed to be working under the table during the fall of 2011, there is insufficient evidence from which the court could reasonably conclude either that the [respondent] worked in any active manner or that he

is able to do so; he has simultaneously applied for disability benefits even while claiming to be able to work, and claims the need to take narcotic medication to control his back and leg pain, although the court received no evidence of medical assessment of the [respondent's] physical status. . . .

"Moreover, despite the group counseling, individual therapy and medication management available to him at [the Morris Foundation] to address his diagnosed anxiety, depression, and sleep disturbances, [the respondent] has never achieved the goal of stable mental health that is implicit in the specific steps' obligation that he [c]ooperate with service providers recommended for . . . mental health treatment. . . . The court fully credits the therapist's conclusions that [the respondent] has made no progress, despite the passage of time, in coping with his symptoms, and that [the respondent] requires additional treatment [of] unspecified duration before he could reasonably be seen to have developed the skills necessary to improve his mental health status. . . . [The respondent] remains relatively expressionless at his individual [Morris Foundation] counseling sessions and does not voluntarily engage in productive conversation, essentially mimicking, in a therapeutic setting, the overly guarded affect he largely displays during visits with his children. The comments [the respondent] recently made to his therapist, indicating that he harbors anger against others and that he has had dreams about hurting people, raise ominous concerns for his ability to provide safe care and supervision for young Elijah and Jasmine, who are fully dependent on reliable adult caregivers to [whom] they can communicate their needs and from whom they can receive prompt support and attention in response.

"[The respondent's] consistent pattern of criminal conduct, and his failure to improve his mental health status while under the multimodal care provided by the

[Morris Foundation] staff, and his failure to improve his parenting skills notwithstanding his completion of the Fatherhood Initiative program, compel the court to conclude that this respondent-father will not acquire a sufficient degree [of] improvement in his unsafe conduct and uncommunicative demeanor during the foreseeable future so as to render him an appropriate parenting resource for his children. Even if [the respondent] could eventually achieve stable mental health and the ability to effectively relate to his children with care and compassion, that goal could not be reached within a period of time that would serve the children's need for caretakers who are available now. [The respondent] will remain unavailable to serve as an appropriate parenting resource for Elijah and Jasmine for a prolonged period of time; his children should not be forced to wait any longer to see whether he can possibly improve the status of his mental health, or his ability to live a lawful lifestyle, while they languish any longer in foster care. . . . Thus, it is [the respondent's] inability or unwillingness to function as a reliable parent, now or in the reasonably foreseeable future, with his inability or unwillingness to timely form a meaningful relationship with his children, [not] his mental health status in and of itself, that leads the court to find that this [respondent] has failed to achieve statutory rehabilitation. . . .

"In determining that [the respondent] has not achieved statutory rehabilitation, the court acknowledges his compliance with some aspects of the specific steps. Despite his arrests in March, 2011, and in September, 2011, probation has not found him in violation of its conditions. . . . He has attended mental health and/or substance abuse evaluation and treatment, although he has not made any progress despite those services, as described above. [The respondent] completed the Fatherhood Initiative program with its parenting and

personal life skills components, and attended all the visits that [the department] scheduled in June, July and August, 2011. . . . This compliance, however, cannot outweigh the clear and convincing evidence that, collectively, establishes that [the respondent] has not achieved a degree of rehabilitation that would reasonably enable the court to believe that at some future date, relevant to the ages and needs of his very young children, he could assume a responsible position in their lives. . . .

"Instead, this scant degree of compliance must be viewed . . . from the historical perspective related to [the respondent's] continued poor judgment, inadequate parenting skills, and lack of commitment to the process of reunification with his children. . . . Elijah came into [the department's] custody nearly immediately after his birth in late December, 2007; even if he lived with [the respondent] and Linda J. from July, 2008, to March, 2010, this child has been . . . in foster care, and out of his father's care, since the latter date. Jasmine has never been cared for by [the respondent]; this child has spent almost twenty-two months, nearly her entire young life, in [the] custody [of the commissioner] with her brother. Despite this long passage of time, despite his chance for reformation during his March, 2010 through March, 2011 prison term, despite his participation in the wraparound services tendered by the Fatherhood Initiative, and despite the flexible visitation sessions offered by [the department], [the respondent] has not yet improved his parenting skills. When he is with Elijah and Jasmine, his conduct and demeanor are detached and largely emotionally sterile, rendering him functionally unavailable to fulfill a parenting role even when he is in the children's physical presence. [The respondent] cannot provide the children with realistic opportunities for the psychological attachment that is a requisite to serving in a parental role. He has not

obtained stable, reliable employment or housing suffi-cient to safely care for the children. . . .

"[The respondent's] judgment remains impaired not-withstanding services, and [the respondent's] life choices support the conclusion that he presents an unsafe parenting resource for Elijah and Jasmine. [The respondent] has admitted that he wants to return to Linda J., despite the dangerous nature of their relation-ship, which has been punctuated by domestic violence. . . . Resuming a life with Linda J. would expose [the respondent], and any children in his care, to her unsta-ble, chaotic lifestyle, and to the violence that has consis-tently marred the [parents'] relationship; to place the children in such an environment would be detrimental to their physical safety and to their overall well-being. [The respondent] has not achieved the capacity to make appropriate decisions concerning his own life; concomi-tantly, he lacks the essential ability to make critical life decisions that would meet his children's best interests, safety or security. . . .

"Notwithstanding the services to which [the depart-ment] has referred [the respondent], and despite his opportunity for rehabilitation through the process of incarceration and probation, he is not able to fulfill a constructive and useful role as a parent for either child. . . . In its entirety, the clear and convincing evidence establishes that the [respondent] . . . cannot meet the needs of either of his children within a reasonably fore-seeable time, given their ages and needs for an appro-priate environment in which to grow and develop in a healthy manner. Because the level of rehabilitation [the respondent] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position . . . in his children's lives, [the department] has proved the § 17a-112 (j) (3) (B) [(ii) rehabilitation] element alleged

as to [the respondent]." (Citations omitted; internal quotation marks omitted.)

After making the required findings delineated in § 17a-112 (k),[5] the court concluded, by clear and convincing evidence, that it was in the children's best interest that the respondent's parental rights be terminated. Accordingly, it granted the termination petitions. This appeal followed.

II

RESPONDENT'S SILENCE AT PLEA HEARING
IN NEGLECT ADJUDICATION

On appeal, the respondent first claims that the court improperly treated his election to stand silent at the plea hearing in his children's neglect proceeding as a tacit admission of the truth of the allegations about him in the neglect petitions. He claims, more particularly, that the court committed reversible error when it made and relied upon the following findings of fact in support of its decision to terminate his parental rights: "On December 22, 2010, when he stood silent to the no contest plea Linda J. tendered in response to [the department's] amended neglect petitions, [the respondent] tacitly authorized the court to accept as true, and to act upon, the facts as alleged by [the department] concerning: his unlawful conduct, which led to incarceration and separation from his children; his inability

[5] General Statutes § 17a-112 (k) provides in relevant part: "[I]n determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered . . . (2) whether the Department of Children and Families has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into and agreed upon . . . (4) the feelings and emotional ties of the child with respect to the child's parents . . . (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child . . . ."

or unwillingness to provide financial support for the children; and the fact that he could not provide a stable home environment that was appropriate for or able to meet the developmental needs of either Elijah or Jasmine. . . . These factors, identified by [the department] in support of its underlying neglect petition[s] and addressed by the specific steps, effectively formed the basis for the court's adjudication of neglect, and constituted the causes for the children's commitment on that date. The clear and convincing evidence establishes that these factors have never been corrected, and confirms that the department has met its burden of proving that [the respondent] has failed to achieve the sufficient degree of rehabilitation as contemplated by § 17a-112 (j) (3) (B) [(ii)]." The respondent claims that such findings improperly treated his silence at the plea hearing as an admission of the facts alleged about him in his children's neglect petitions, in violation of his rights under Practice Book § 35a-1 (b).

The commissioner disputes the respondent's claim on several grounds. First, she argues that the court's challenged findings did not attribute evidentiary significance to the respondent's election to stand silent at the plea hearing. Instead, she contends, the court's description of the plea hearing accurately stated that, by electing to stand silent at that hearing, he in fact tacitly authorized the court to adjudge his children neglected based solely upon the commissioner's pleaded allegations even though he, as the children's noncustodial parent, never admitted them. Thus, claims the commissioner, the court's description of the process by which the respondent's children were adjudged to be neglected is completely accurate, for it does not even state that the respondent, by his silence, admitted the truth of the allegations pertaining to him.

Second, the commissioner argues that even if the court's description of the process by which the respondent's children were adjudged to be neglected can be

construed to treat his silence at the plea hearing as a tacit admission of the truth of the allegations about him in the neglect petitions, the only role such evidence played in the court's comprehensive termination decision was prefatory and procedural rather than substantive. On this score, the commissioner argues, more particularly, that the challenged findings merely described the putative basis upon which the court in the neglect proceeding adjudged the respondent's children to be neglected and issued specific steps for him to follow to achieve personal rehabilitation as a parent, and thus reunification with his children. Such findings did not, she claims, concern or contribute to proving either of the principal substantive issues in the termination proceeding, which were whether the department had made sufficient efforts to reunify the respondent with his children after they were adjudged to be neglected and whether the respondent, by complying with the specific steps issued to him after the neglect adjudication, made sufficient progress in rehabilitating himself as a parent to warrant continuing the department's efforts to reunite him with the children. For the following reasons, we agree with the commissioner that even if the court's description of the plea hearing can be construed to suggest that it considered his silence at that hearing to have been a tacit admission of the truth of the allegations about him in the neglect petitions, those findings were harmless, as they had no substantive impact on the outcome of this proceeding.

Practice Book § 35a-1 establishes the general procedure to be followed at the plea hearing in any proceeding concerning a neglected, uncared for or dependent child or any proceeding for termination of parental rights.[6] Section 35a-1 (a) provides that at any such hearing, the court must inquire of the respondent parents

---

[6] Practice Book § 35a-1 provides: "(a) Notwithstanding any prior statements acknowledging responsibility, the judicial authority shall inquire whether the allegations of the petition are presently admitted or denied.

whether the allegations of the petition concerning their child are presently admitted or denied. Section 35a-1 (b), in turn, authorizes the court, in the event that a parent either admits or pleads nolo contendere to the allegations of the petition, to accept and proceed to judgment on the basis of that admission or plea, provided it further determines, upon canvassing the admitting or pleading parent, that he or she thereby waives his or her right to trial on those allegations with an understanding of the contents and the consequences of his or her admission or plea.

The consequences of an express admission are well understood to be that the parent admits the truth of the facts alleged in the petition for all purposes and agrees to the entry of judgment with respect to his or her child on the basis of those admitted facts. Such an admission can be used against the admitting parent in any future proceeding to which the admission is legally relevant. By contrast, the consequences of a plea of nolo contendere, which is not based upon an express admission of the allegations of the petition, is that those allegations are tacitly admitted for the purpose of the proceeding where the plea is entered, with the understanding that judgment may enter against the pleader with respect to his children on the basis of such allegations. Although a *judgment* entered against a party on the basis of a plea of nolo contendere can later be used

This inquiry shall be made of the parent(s) or guardian in neglect, abuse or uncared for matters, and of the parents in termination matters.

"(b) An admission to allegations or a written plea of nolo contendere signed by the respondent may be accepted by the judicial authority. Before accepting an admission or plea of nolo contendere, the judicial authority shall determine whether the right to trial has been waived, and that the parties understand the content and consequences of their admission or plea. If the allegations are admitted or the plea accepted, the judicial authority shall make its adjudicatory finding as to the validity of the facts alleged in the petition and may proceed to a dispositional hearing. Where appropriate, the judicial authority may permit a noncustodial parent or guardian to stand silent as to the entry of an adjudication."

as evidence against that party in any future proceeding to which the judgment is legally relevant, the *plea* itself is not admissible against him in any such later proceeding, either as an admission of the truth of the allegations underlying the claim or charge to which he pleaded or for any other purpose.

The only exception to the previously described plea and waiver procedure in proceedings subject to Practice Book, 2011, § 35a-1 (b) is that established for certain noncustodial parents by the final sentence of that rule, which reads as follows: "Where appropriate, the judicial authority may permit a noncustodial parent or guardian to stand silent as to the entry of an adjudication." This provision does not condition the entry of an adjudication as to the child of a noncustodial parent who is permitted to stand silent upon a waiver by that parent of his or her right to trial, or upon a determination that such parent understands the consequences of his or her decision to stand silent. The threshold question presented by the respondent's first claim on appeal is whether those consequences, like those of an express admission, may lawfully include the later use of the parent's silence at the custodial parent's plea proceeding as a tacit admission of the truth of allegations as to which he stood silent, as the respondent claims to have happened in this case. Because resolution of this issue requires us to interpret Practice Book § 35a-1 (b), the issue presents us with a question of law over which our review is plenary. *Wiseman* v. *Armstrong*, 295 Conn. 94, 99, 989 A.2d 1027 (2010).

Although there is no case law in this state that specifically addresses the consequences for a noncustodial parent of electing to stand silent in a neglect proceeding pursuant to Practice Book § 35a-1 (b), our Supreme Court's analysis in *In re Samantha C.*, 268 Conn. 614, 847 A.2d 883 (2004), is instructive on this issue. There, the court examined the issue of whether then existing

Practice Book, 2001, § 34-1 (f)[7] allowed an adverse inference to be drawn against respondent parents in a termination proceeding for their failure to testify at trial in that proceeding.[8] After a thorough analysis of the language of Practice Book, 2001, § 34-1 (f), its relationship to the statutes it was designed to implement, the official commentary to the rule, the policy behind the rule's adoption and common-law and constitutional principles governing analogous situations, the court concluded, as a threshold matter, that "§ 34-1 (f) did not preclude the trial court from drawing an adverse inference from the respondents' failure to testify." Id., 640. In reaching that result, the court reasoned that termination proceedings, like neglect proceedings, are not quasi-criminal, but "remedial and essentially civil in nature. . . . [T]he legislature [thus] did not intend to insulate parents from adverse inferences drawn from their failure to testify at termination proceedings." (Citations omitted; internal quotation marks omitted.) Id., 651–52. Disagreeing with the respondents that the rule protecting their right not to testify would be rendered meaningless if an adverse inference could be drawn against them based upon their silence in a termination proceeding, the court further observed that: "Although the rule would have provided a parent with greater protections if it also barred adverse inferences, the rule nonetheless provided a parent with a privilege that is ordinarily not available in civil proceedings,

[7] Practice Book, 2001, § 34-1 (f) provided: "Any child shall have the right to remain silent at any stage of the proceedings. No parent who is the subject of a petition shall be compelled to testify if the testimony might tend to incriminate in any criminal proceeding or to establish the validity of the facts alleged in the petition."

Practice Book, 2001, § 34-1 (f) was repealed as of January 1, 2003.

[8] Although the issue in *In re Samantha C.* arose in the context of the respondent parents' failure to testify in a termination proceeding, versus a neglect proceeding as in the case at hand, the court's reasoning is instructive because Practice Book, 2001, § 34-1 (f) applied to any stage of a child protection proceeding.

namely, the right not to be called as a witness. This rule forced the petitioner to prove the allegations in the petition in ways other than through the parent's testimony. There is no doubt that a parent, faced with the choice of testifying or suffering an adverse inference, may feel compelled to testify in some sense of the word; but he or she still has a choice, albeit a difficult one, whether to testify in rebuttal to the allegations made by the petitioner, or to remain silent and require the petitioner to prove the allegation by clear and convincing evidence." Id., 665.

Notwithstanding the foregoing conclusion, the court in *In re Samantha C.* was careful to clarify the significant difference between drawing an adverse inference from a parent's silence in the trial of a termination proceeding and treating such silence as a tacit admission of the allegations of the termination petition, as might be done upon the entry of a plea of nolo contendere. On that score, the court declared that "an adverse inference," unlike a tacit admission, "cannot supply proof of a material fact; it merely allows the fact finder to weigh facts already in evidence." Id.

Finally, the court noted that the then-existing provisions of Practice Book, 2001, § 34-1 (a), expressly required the trial court to advise parent-respondents in termination proceedings of their right to silence in such proceedings. In light of that requirement, the court concluded that "if a trial court is inclined to draw an adverse inference against a parent for his or her failure to testify in a termination proceeding, it is incumbent upon the court to advise the parent accordingly." Id., 666. Because the trial court in the case before it had not advised the respondents that their silence could later be construed adversely to them, the court in *In re Samantha C.* reversed the judgment against them and remanded the case for a new termination trial. Id., 675.

The upshot of *In re Samantha C.* is that a parent's election to stand silent in the face of allegations concerning his conduct cannot be treated as an admission, tacit or explicit, of the truth of such allegations, either in the proceeding where he elects to stands silent or in any other proceeding. Instead, where the proceeding is contested, the parent's silence may serve only as a basis for the drawing of an adverse inference against him in that proceeding when the other evidence for and against him in that proceeding is weighed. In no event, however, can such an adverse inference be drawn against him in any proceeding where he is not warned in advance that one permissible consequence of his silence may be the drawing of such an adverse inference.[9] Where, however, as here, the proceeding is not contested because the custodial parent elects to admit or plead nolo contendere to the allegations of the petition, the practical consequence of standing silent is to authorize the court to enter judgment with respect to the silent parent's child based upon the allegations of the petition and the other parent's admission of or plea of *nolo contendere to those allegations.*

Against this background, the trial court's finding with respect to the respondent's election to remain silent at the plea hearing in his children's neglect proceeding offered an accurate description of the respondent's conduct at that hearing and of its practical consequences. Although the respondent, by his silence at that hearing, surely did not admit the allegations of the neglect petitions to which his children's mother pleaded nolo contendere, he just as surely stood aside and allowed

---

[9] Practice Book § 35a-7A, effective January 1, 2009, provides: "If a party requests that the judicial authority draw an adverse inference from a parent's or guardian's failure to testify or the judicial authority intends to draw an adverse inference, either at the start of any trial or after the close of the petitioner's case-in-chief, the judicial authority shall notify the parents or guardian that an adverse inference may be drawn from their failure to testify."

judgments of neglect to enter as to his children on the basis of those allegations. To the extent that the trial court's finding can be so construed, it was accurate in fact and correct in law.

The sole aspect of the trial court's challenged finding that risked implying that the respondent, by his silence at the plea hearing, did more than merely stand aside and allow the court to enter judgment with respect to his children based upon the commissioner's allegations was its statement that, by his silence, he "tacitly authorized the court" not only to "act upon" those allegations, but to "*accept as true* . . . the facts as alleged by [the department] concerning: his unlawful conduct, which led to incarceration and separation from his children; his inability or unwillingness to provide financial support for the children; and the fact that he could not provide a stable home environment that was appropriate for or able to meet the developmental needs of either Elijah or Jasmine." (Emphasis added.) Such a statement can reasonably be understood to state that the respondent tacitly admitted the truth of those allegations, which in fact the respondent never did. Relying materially upon such a silence based finding as a basis for deciding any of the ultimate issues in a termination proceeding would constitute reversible error, because it would not only allow the noncustodial parent's silence to be used as a basis for finding contested facts against him, but it would allow improper use of his silence against him in a different proceeding than that in which he stood silent, all without advance warning that those could be the consequences of his election.

Here, however, a close examination of the trial court's detailed termination decision clearly demonstrates that the challenged finding played no role at all in the court's resolution of the ultimate issues before it in this proceeding. Those ultimate issues, upon which the court's termination decision depended, were: (1) whether or

not the department had made reasonable efforts to reunify the respondent's children with him after they were adjudged to be neglected, in accordance with General Statutes § 17a-111b (1); and (2) whether or not the respondent, having been provided with specific steps to take to facilitate the return of the children to him after they had been adjudged to be neglected, had achieved a sufficient degree of personal rehabilitation to encourage the belief that within a reasonable time, considering the ages and needs of the children, the respondent could assume a responsible position in their lives. As documented at length in the first part of this decision, the court based its findings on these issues on the substantial evidence laid before it in records of the department and in the testimony of caregivers and social workers as to the respondent's consistently deficient efforts to achieve the requisite degree of personal rehabilitation. The challenged finding, which merely purported to explain how the neglect adjudications occurred and specific steps came to be issued to the respondent thereafter, simply had no bearing on whether or how the respondent complied with such specific steps or what measure of success, if any, he achieved in his rehabilitative efforts. Therefore, the court's error, if any, in attributing evidentiary significance as an admission to the respondent's silence at the plea hearing in his children's neglect proceeding was harmless, as it had no effect whatsoever on the outcome of this termination proceeding.

III

SPECIFIC STEPS TO ACHIEVE PERSONAL
REHABILITATION

The respondent also claims that the trial court improperly terminated his parental rights because the neglect court failed to order and provide specific steps for him to follow when his children were adjudged to

be neglected, as required by General Statutes §§ 46b-129 (j) and 17a-112 (j). As noted previously, however, the neglect court first issued specific steps for each parent and the department on September 10, 2010, when it granted the ex parte application for the OTC. The neglect court again addressed the specific steps on September 17, 2010, during the preliminary hearing on the OTC, and the respondent confirmed that he had received a copy of the specific steps. Those same steps were discussed with the respondent again on October 20, 2010, when the neglect court advised him of his various rights as a parent in a neglect proceeding. Finally, on December 22, 2010, at the end of the plea hearing in the neglect proceeding, where the respondent stood silent while Linda J. entered her nolo plea, the neglect court again reminded the respondent of the necessity that he comply with the specific steps that had previously been issued to him, and the respondent acknowledged his obligation to do so.

At oral argument before this court, counsel for the respondent acknowledged that if the specific steps previously issued to the respondent were reaffirmed at the December 22, 2010 plea hearing, then the statutory requirement that they issue following the children's neglect adjudication was met. He contends, however, that the neglect court did not, in fact, reaffirm the steps on December 22, 2010. We disagree. On that date, after the neglect court entered the order of commitment, it directly addressed the respondent regarding the specific steps and warned him that "[f]ailure to comply with any of the steps would be used against you by the department of children and families . . . if the matter comes to a termination hearing."[10] We cannot fathom

---

[10] Additionally, we note that on January 20, 2012, during the termination trial, the respondent reviewed the specific steps and the transcript of the December 22, 2010 hearing, agreed that he was present in court when those steps were ordered, and agreed to the admission of those steps as an exhibit in the termination trial.

any reasonable interpretation of the neglect court's admonition to the respondent to comply with the specific steps if it was not to reaffirm them. Therefore, the trial court properly found that the neglect court had issued specific steps for the respondent to follow and he failed to follow them.

The judgments are affirmed.

In this opinion the other judges concurred.